CHAMPION VENTURES, INC., and Jack Bradley, Jr., Appellants (some of Defendants below),

v.

Wayne H. DUNN, Appellee (Plaintiff below).

No. 4709.

Supreme Court of Wyoming.

Aug. 8, 1977.

Arthur Kline, of Kline & Swainson, Cheyenne, for appellants.

Richard S. Dumbrill, of Jones & Dumbrill, Newcastle, for appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

ROSE, Justice.

The principal question raised in this appeal is whether Appellants Champion Ventures, Inc. and Jack Bradley, Jr., two of the defendants below, converted oil well casing pipe owned by the appellee, Wayne H. Dunn, plaintiff below. Appellants are the owners, by assignment, of 65 percent of the record title in a federal oil and gas lease, covering property located in Campbell County, Wyoming. Appellee is the owner of casing pipe which is in an oil well located on the subject property.

After a trial before the court, it entered a judgment finding appellants guilty of conversion and awarding appellee damages in the amount of $21,500.00, plus costs. We will reverse the district court's judgment finding appellants guilty of conversion.

## FACTS

On November 21, 1971, an oil well was completed on property then being leased by the Saxon Oil Company. Saxon owned a 65 percent interest in the lease, and the re-

maining interests were owned by several of the defendants below. Saxon owned a 68.5 percent interest in the well equipment. After the well casings were set at the 7,400–foot level, and the sands were tested for oil, the owners determined the well to be non-commercial. On March 28, 1972, the lease operator, Joe Banks, filed a notice of intent to abandon the well, which was approved two days later. On May 17, 1972, Saxon conveyed its salvage rights in the well casing and equipment to the Western Standard Corporation for $5,400.00. Western subsequently sold this casing and equipment to Richard Shanor in August or September, 1973. Shanor proceeded to remove the well equipment to another well, but left the casing in the ground. On December 10, 1973, Saxon conveyed its entire leasehold interest to appellant, Jack Bradley, Jr. This assignment was approved by the Cheyenne Office of the Bureau of Land Management on April 1, 1974, to be retroactively effective on January 1, 1974. Bradley was aware at the time of this conveyance that Shanor owned the salvage rights in the well casing, and unsuccessfully attempted to buy it from Shanor. On December 22, 1973, Bradley sold a 10 percent interest in the lease to appellant, Champion Ventures. Bradley, then, became operator of the lease on January 1, 1974. On January 25, 1974, Shanor sold his interest in the well casing to appellee Wayne H. Dunn for $12,000.00. Prior to this purchase, appellee did not check the records of Campbell County, the Bureau of Land Management, or the United States Geological Service. Shanor had informed him that there had been an abandonment order issued on the well. After the purchase, appellee talked to Joe Banks, who also indicated there had been an abandonment order issued. In early March, 1974, appellee, when seeking a copy of this order, talked to Glenn Worden, District Engineer for the U.S.G.S. in Newcastle. Worden informed appellee that he could not remove the well casing without the approval of the operator. By designation of the owners, Champion Ventures had become the operator of the leasehold, with Bradley named as its agent.

In late March or early April, 1974, appellee-Dunn informed Bradley that he did not want anything placed in the well casing. Nevertheless, over appellee's objection, Bradley proceeded to perform a swabbing test on the well. In letters, dated April 18 and May 2, appellee's attorney demanded that appellants cease their use of the well casing. Subsequently, the present action was commenced, resulting in the judgment appealed from, which provides in pertinent part:

"That the defendants Jack Bradley, Jr. and Champion Ventures, Inc. took possession of the casing located in the well in SW¼NW¼ Section 15, Township 42 North, Range 70, Campbell County, Wyoming, with full knowledge that it belonged to the plaintiff Wayne H. Dunn; that the defendants Jack C. Bradley, Jr. and Champion Ventures, Inc. used the casing for the benefit of their own business interest; that they exercised control over and asserted rights to the casing as if they were the owners of the casing; that the acts of the defendants under all the circumstances constitute a conversion of the property, and entitle the plaintiff to relief of an equitable nature."

## APPELLATE CONTENTIONS

On appeal, appellants contend that (1) appellees had no right to possession of the casing until the well is declared nonproductive by the U.S.G.S.; (2) appellants did not wrongfully take the casing; (3) the award of damages is unsupported by the evidence; and (4) the district court erred in refusing to allow certain witnesses to testify as experts. Appellee asserts that (1) as owner of the casing, he was entitled to its possession, use and enjoyment, in light of the previously issued notice of intent to abandon the well; (2) there is sufficient evidence pertaining to damages when considered in a light most favorable to appellee; and (3) the district court properly exercised its discretion in refusing to allow certain witnesses to testify as experts. Since we find that there was no conversion of the casing, we need not reach the remaining issue.

## CONVERSION

■ We have previously stated that where a defendant comes rightfully into possession of another's property, he commits conversion when he deals with such property in a wrongful manner in circumstances where the plaintiff has the right to immediate possession. *De Clark v. Bell*, 10 Wyo. 1, 65 P. 852, 853. In all cases where a defendant is rightfully in possession, both a demand for possession and an absolute refusal to deliver the property are necessary before a suit will lie for conversion. *Fletcher v. Pump Creek Gas & Oil Syndicate*, 38 Wyo. 329, 266 P. 1062, 1064–1065. The record in the instant case indicates that there was an adequate demand and refusal and, therefore, we turn to a discussion of appellee's right to immediate possession of the well casing. If no such right existed at the time of the alleged conversion, then it follows that appellants could not have committed a tortious act in derogation of appellee's rights in the well casing.

■ All of the transactions pertinent to this case emanated from the Saxon Oil Company, which originally held a 65 percent interest in the oil and gas lease and a 68.5 percent interest in the well casing and equipment. Saxon was entitled to assign its interests in the lease, separate from its interest in the well casing and equipment. The separate nature of these interests is indicated by the fact that if Saxon had conveyed its leasehold interest, without mention of the equipment, it would have retained its interest in such equipment. 3 Summers, Oil and Gas, § 555, at 661–662 (1958). When oil well casing and equipment are conveyed separate from the leasehold, the assignee of the equipment cannot obtain any rights greater than those of his assignor. *Okmulgee Supply Corporation v. Anthis*, 189 Okl. 1139, 114 P.2d 451, 453. Applying these principles to the instant case, appellee, as the assignee of the well casing, obtained no greater rights in that casing than those held by his predecessors— Shanor, Western Standard Corporation, and Saxon Oil Company. It is necessary, therefore, to determine the nature and extent of appellee's rights in the casing by reference to the rights of others.

According to the terms of the federal oil and gas lease applicable to this case, found in Section 2(j), the lessee agreed

"to carry on all operations in accordance with approved methods and practice as provided in the Oil and Gas Operating Regulations, . . . to plug properly and effectively all wells drilled in accordance with the provisions of this lease . . . before abandoning the same."

The provisions of the Code of Federal Regulations, in effect at all times pertinent herein, indicate in part that:

". . . Before beginning abandonment work on any well, whether drilling well, oil or gas well, water well, or so-called dry hole, notice of intention to abandon shall be filed with the supervisor and approval obtained before the work is started. . . . (30 C.F.R. § 221.58(k) (1968))

". . . After a well is abandoned or plugged a subsequent record of work done must be filed with the supervisor. This report shall be filed separately within 15 days after the work is done. . . ." (30 C.F.R. § 221.58(1) (1968))

The record indicates that a notice of intent to abandon was approved by the Supervisor, Glenn Worden, on March 30, 1972. No subsequent report after abandonment was ever filed. According to the testimony of Worden, an intent-to-abandon report is approved only if the abandonment is justifiable and certain minimum plugging requirements are met. In determining whether the abandonment is justifiable, the U.S.G.S. considers "the prospect for further profitable production." Worden also testified that generalized instructions from the U.S.G.S. area supervisor to the district engineers were to the effect that an intent-to-abandon report may be "nullified by either direct notification to the operator or it is assumed in most cases that it has expired if there has been no application for extension" after a 90-day period, commencing on the date the report is approved. Insofar as the United States government is concerned, the

intent-to-abandon report in this case expired 90 days after its approval, or on June 30, 1972. Finally, Worden testified that in order to pull a well casing, with U.S.G.S. approval, the person seeking to perform that task has to be a designated operator who "was obligated under the bonding requirement of the leasehold" or have such a person's permission.

■ These various lease provisions, regulations, and rules of practice are set forth because of the general principle which holds that "the assignee of an oil and gas lease acquires the interest of his assignor." This generally means that the assignee obtains the privilege of operating the land for oil and gas purposes, subject to the covenants and conditions of the lease. 3 Summers, Oil and Gas, § 555, at 661 (1958). This principle is equally applicable to the assignee of well casing and equipment being used on the leasehold. *Okmulgee Supply Corporation v. Anthis*, supra. Since an assignee of such equipment takes his property subject to the conditions of a lease, and since he can acquire no rights therein which are greater than those of his assignor, appellee's rights in the well casing must be determined in light of the rules and regulations which we have set forth. In addition to these standards, there are certain general principles applicable to the instant case. It is said that

> "[w]here a well is a producer, and conditions justify the conclusion that the enterprise is successful and that oil and gas may be produced in paying quantities, the lessee does not have the right to draw the casing and thereby destroy the well." 58 C.J.S. Mines and Minerals § 212. b., at 536 (1948).

See *Orfic Gasoline Production Co. v. Herring*, Tex.Civ.App., 273 S.W. 944, 945; and *Woodson Oil Company v. Pruett*, Tex.Civ. App., 298 S.W.2d 856, 857. The true criterion for determining whether a well is a commercial producer is: Will it pay a profit to the lessee, over operating expenses, for its operation? If so, the well may be said to produce in paying quantities, even though the profit is small and the costs of develop-

ment may never be recovered. *Sunburst Oil & Refining Co. v. Callender*, 84 Mont. 178, 274 P. 834 (1929).

■ The judgment and good faith of the lessee is measured by whether the lease is producing, or by the exercise of reasonable skill and diligence could be made to produce, sufficient oil and gas to justify a reasonable and prudent operator in continuing the operation. *Okmulgee Supply Corporation v. Anthis*, supra, at 453.

Only a handful of cases could be found which deal with the relative rights of parties separately owning interests in a leasehold, and in well casing and equipment. In *Okmulgee Supply Corporation v. Anthis*, supra, a man named Briggs, who was the owner of an oil and gas lease and certain oil field equipment, sold the equipment to Okmulgee and thereafter sold the lease to McPherson. Okmulgee attempted to remove the equipment, but McPherson and Anthis, one of the owners of the leased land, sought to restrain the removal. Okmulgee asserted that it made the equipment purchase in reliance upon the statement of Briggs that the lease was no longer producing in paying quantities, and that Briggs' judgment was conclusive on this question. The court disagreed and held that the lease was producing, laying the basis for its decision which went on to hold that Okmulgee had no right to remove the equipment inasmuch as this would violate the landowners' interest in the mineral rights. The court also affirmed the lower court's determination that Okmulgee was entitled to receive the reasonable rental value of the equipment from McPherson—this being viewed as equitable under the circumstances.

In *Cox v. Rhodes*, Tex.Civ.App., 233 S.W.2d 924, appellants were the assignees of a lease and certain well equipment. In 1946 all production on the leased premises ceased. In March, 1947, appellants attempted to restore pressure in the oil-bearing sands but were unsuccessful. Appellants then executed a release of their leasehold interest in June, 1947. During negotiations for a new lease, appellants discovered that a lease had been executed to appellees

in March, 1948. This lease contained a recital that the well casing was to remain the property of the lessors. The new lease was conditioned on a reworking of the lease by appellees, but such work had not commenced at the time appellants learned of the new lease. The Court of Civil Appeals of Texas agreed with appellants' contention that the lease did not transfer title to the casing from appellants to appellees. The court continued by stating that the lease, *under its terms,* terminated when production ceased in 1946, which gave appellants the right to remove the casing within a reasonable time. The case was remanded for a jury determination as to whether a reasonable time had elapsed by the time appellees acquired the lease. In this regard the court stated:

". . . If the facts would have sustained a jury finding that a reasonable time in which appellants could have pulled the casing had not elapsed since the termination of the lease, as we have held, and the jury would so find, then the title to the casing was still vested in appellants and we think the evidence was sufficient to show a conversion even though appellants did not show their right to plug the well and pull the casing. A repudiation or denial of the owner's right or title to personal property and exercise of dominion over such property in denial of and inconsistent with such right or title may constitute a conversion, even though the person exercising such dominion may have come lawfully into possession of such property and there be no unlawful interference with the owner's possession thereof. 42 Tex.Jur. p. 518, Section 12; *Jordan v. Broad,* Tex. Civ.App., 170 S.W.2d 655, loc. cit. 656 (1–3). *And even though the true owners may not be in possession of the property nor entitled to the immediate possession thereof.* 42 Tex.Jur. p. 531, Sec. 21; *Cox v. Patten,* Tex.Civ.App., 66 S.W. 64, writ denied. Here the appellee landowners asserted their ownership of the casing and denied appellants' title thereto by their lease of same to the Drisco Oil Company and by their refusal to negotiate with

appellants for reasonable compensation for use thereof. Appellees also denied appellants access to the well for the purpose of salvaging their casing. These acts were sufficient to constitute a conversion of the casing *even though appellants did not have the present right to salvage it."* 233 S.W.2d 928–929. [Emphasis supplied]

The *Cox* court's reference to appellants' right to immediate possession was in response to appellees' argument that even if title to the casing did not pass by virtue of the release, appellants

". . . did not allege or prove that they had procured permission from the Railroad Commission to plug the well and pull the casing, and that the uncontroverted evidence shows that the Railroad Commission would not have granted them permission to do so since it appears that well No. 1 was at all times capable of further production at another stratum and had been reworked and was a producing well at the time of the trial. . . ." 233 S.W.2d 928.

■ We find that appellee-Dunn's reliance on *Cox v. Rhodes,* supra, is misplaced inasmuch as Texas seems to have a rule which is different from that announced by this court in *De Clark v. Bell,* supra. In Wyoming, the plaintiff in a conversion action must show the right to *immediate* possession of the goods allegedly converted. See also 89 C.J.S. Trover and Conversion § 72, at 570–571; and *Cox v. Rhodes,* supra, at 929 (dissenting opinion).

■ A reading of the record in this case indicates that appellee failed to sustain his burden of proving his right to immediate possession of the casing at the time of the alleged conversion. In order to sustain this position, it was incumbent upon appellee to show that the U.S.G.S.'s intent-to-abandon report was still in effect, or that the well in question was not capable of producing paying quantities of oil. The only evidence adduced at trial by appellee in this regard was that he had relied on Richard Shanor's and Joe Bank's statements that an aban-

donment order had been issued on the well. Appellee admitted that he made no effort to independently check out the production status of the well with the U.S.G.S. If he had, we must assume that Mr. Worden would have informed him that the abandonment report had expired. Furthermore, the fact that a new operator had been designated for the lease—whose permission to pull the casing was required by the U.S.G.S.—could have also been ascertained by an inquiry of the U.S.G.S. It should be noted that Joe Banks designated appellant-Bradley as the new operator on or about January 1, 1974—prior to the date of appellee's purchase. We make these observations in an effort to point out that appellee could have ascertained the extent of his salvage rights. These rights were subject to the conditions of the lease which had been issued, and the rules and regulations which, in turn, limited the lease. Under these various conditions, there was no right, without the designated operator's permission, to pull the well casing on or about the date of the alleged conversion. Appellee, therefore, failed to prove the required element of a right to immediate possession.

Appellee's failure to show his right to immediate possession of the casing is evident, notwithstanding the fact that the record is unclear as to whether or not the well was capable of producing oil or gas in paying quantities at the time of the alleged conversion. The trial court made no finding in this regard, and we will not speculate as to its conclusion on this question. We only say that proof, or the lack thereof, is not dispositive in this situation although it may be in others.

### DAMAGES

Even if this court could find that appellants had converted the well casing in question, we would be hard-pressed to find that appellee had shown damages which were anything but speculative. As claimant, appellee had the burden of proving the value of his property at the time of the alleged conversion. *International Distress Signals, Inc. v. McDowell*, Wyo., 519 P.2d 224, 226. He was required to show by competent evidence the fair market value of the casing at the time and place of such conversion. *Suchta v. O. K. Rubber Welders, Inc.*, Wyo., 386 P.2d 931, 934. Of the 7,400 feet of casing which was in the ground, appellee thought he could recover 6,400 to 6,500 feet, and that at a minimum 5,000 feet would be in good condition. But appellee, as well as all other witnesses on this point, admitted that the removal of the casing could result in damage. An attempt to ascertain the potential damage, which would have decreased the fair market value substantially, would be purely speculative in light of the evidence produced in this case.

We hold, therefore, that appellee failed to prove his right to immediate possession of the well casing and thereby failed to sustain his action for conversion against appellants, and that there was, in any case, insufficient evidence of damages to support the judgment.

Reversed.

THOMAS, Justice, concurring, with whom GUTHRIE, Chief Justice, joins.

I agree that the majority opinion in this case correctly disposes of the issues posed in the appeal. I am concerned, and I believe others on the Court are concerned, with a situation in which property concededly owned by the Appellee is, as a matter of law, made available for use by the Appellant in a business venture which potentially is a profitable one. I am persuaded that under the circumstances a constructive lease does exist.

In the district court the Appellee, plaintiff there, sought alternative relief in the form of reasonable rental value of the casing. That alternative relief was not afforded by the district court because it held in favor of the Appellee on his conversion theory. I would understand that the effect of this reversal must be that the case is remanded to the district court which then should proceed to make disposition of any other claims for relief presented by the Appellee as it would have, had it, instead of

this Court, ruled against the Appellee on his conversion theory. While concededly the issue of a reasonable rental value presents significant difficulty, it apparently has been successfully disposed of in other situations by other courts, and the interests of justice have been well served by such an approach.